1    **WO**

2

3

4

5

6                      **IN THE UNITED STATES DISTRICT COURT**

7                          **FOR THE DISTRICT OF ARIZONA**

8

9    Helena Carolina,                          No. CV-19-05882-PHX-DWL

10                   Plaintiff,                 **ORDER**

11   v.

12   JPMorgan Chase Bank NA, et al.,

13                   Defendants.

14

15          In this action, Helena Carolina ("Plaintiff") asserts a pair of related employment

16   discrimination claims against her former employer, JPMorgan Chase Bank, N.A.

17   ("JPMC"), and her former JPMC supervisor, Jason Tidd (together, "Defendants").  Now

18   pending before the Court is Defendants' motion for summary judgment.  (Doc. 33.)  For

19   the following reasons, the motion is granted.

20                                  **BACKGROUND**

21   I.     Factual History

22          The facts below are taken from the parties' summary judgment submissions and

23   other documents in the record.  The facts are uncontroverted unless otherwise noted.[1]

24          In June 2011, JPMC hired Plaintiff.  (Doc. 33-1 at 58.)  Plaintiff is "Asian (non-

25   white) by race; Indonesian by national origin" and "was the only Asian and the only

26   ─────────────────────

27   [1]     Plaintiff objects to all of Defendants' summary judgment exhibits on authentication
     and/or hearsay grounds.  (Doc. 40 at 1-6.)  As discussed below, these objections are
28   unavailing.  Thus, throughout this fact section the Court will only note when Plaintiff
     contests the substance—not the admissibility—of an assertion.

Indonesian on [her] team the entire time [she] worked" for JPMC.  (Doc. 40-1 at 3 ¶¶ 2, 5.)

Between her hiring date and late 2017,  Plaintiff was placed on a performance action plan (Doc. 33-1 at 44) and subjected to three "documented discussions"[2] in which she was warned, respectively, of unsatisfactory performance, tardiness, and potential legal violations (*id.* at 45-47).   A 2015 scorecard explained that Plaintiff's year was "very successful" but also noted that Plaintiff "had several complaints registered with violations" and that Plaintiff was experiencing "ongoing issues with FDCPA [Fair Debt Collections Practices Act] violations" that "expose Chase to law suits because we're violating state laws when the violations happened."  (*Id.* at 48.)

On September 10, 2017, Plaintiff transferred to JPMC's Home Lending Recovery division and began working as a Recovery Senior Specialist III.  (*Id.* at 15-16.)  Plaintiff described her work in the Home Lending Recovery division as "very challenging," "more challenging than other departments at [JPMC]," because JPMC is "ready to write off" defaulted loans.  (*Id.* at 16-17.)  Plaintiff was tasked with trying "to recover the account and then contact with the customer, negotiate how to handle the balance, what they want to do with that account, and so before they write-off, we negotiate first, how far we allow the customer to make the payment to make the account current again."  (*Id.* at 18.)

Shortly after her transition to the Home Lending Recovery division, Plaintiff was generally viewed as a capable new member, even if supervisors saw room for improvement.  In Plaintiff's annual performance review for 2017, which was issued by Tidd on December 20, 2017, Tidd gave Plaintiff a "strong" rating in the Business Results category, noting that Plaintiff "achieved goal 1st month on the floor" and "picks up on things quickly and will continue to grow in this area," but gave Plaintiff only an "on track" rating in the Client/Customer Focus Category, noting that Plaintiff "needs to slow down and try to help customer.  Sometimes she gets going way to[o] quick and doesn't hear what

---

[2]    According to evidence proffered by Plaintiff, "a documented discussion is a verbal discussion" that is "treated as a lesser form of discipline than a written warning."  (Doc. 40-1 at 122, 131.)

they truly need." (Doc. 40-1 at 9.)  In the section entitled Manager Comments, Tidd summarized: "Overall [Plaintiff] has been a good addition to the recovery area.  She has really picked up on things quickly and taken off.  She does need to slow down and listen to customers.  I will continue to work with her and help her improve in this area." (*Id.* at 10.)

Beginning in 2018, things took a turn for the worse.  As discussed below, between April 2018 and October 2018, Plaintiff was involved in five separate incidents in which she was accused of performance-related errors and misconduct:

▪ First, on April 18, 2018, Tidd issued Plaintiff a formal written warning for hanging up on a caller who had requested an escalation to management.  (Doc. 33-1 at 55 [Plaintiff "was observed by our QA [quality assurance] Group . . . not following our QA procedures. Third Party asked to speak to someone else and [Plaintiff] did not attempt to transfer to escalations and proceeded to disconnect call."].)[3]  The warning stated that Plaintiff's "unsatisfactory performance continues to expose the bank to risk and negatively impact our customer experience." (*Id.*)

▪ Second, on August 13, 2018, Tidd had a conversation with Plaintiff in which he corrected her for failing to verify the Social Security number of a customer, providing an incorrect payment amount, and improperly escalating a caller to management.  (Doc. 33-1 at 60.)[4]

---

[3]     It is undisputed that the written warning was given.  Plaintiff contests Defendants' characterization of the call and requests an adverse inference as to the call's contents. Those arguments are discussed *infra*.

[4]     Although the records provided by Defendants characterize this August 13, 2018 conversation as a "coaching" (Doc. 33-1 at 60), Plaintiff asserts in a declaration that "Tidd never characterized these interactions with me as 'coaching' and he did not wait around to have me ask or tell my side of the story" (Doc. 40-1 at 5 ¶ 29).  This dispute over how to characterize the August 13, 2018 conversation is irrelevant—regardless of whether it qualified as a "coaching," it is undisputed that Tidd had a conversation with Plaintiff about mistakes she had committed during a phone call with a client, and Plaintiff does not argue (or, at least, does not develop the argument in any coherent fashion) that her termination was improper because it could only be based on formal coachings.

▪ Third, on September 19, 2018, Tidd had a conversation[5] with Plaintiff in which he corrected her for failing to "fill document for deal out properly." (*Id.*)

▪ Fourth, on October 26, 2018, Plaintiff took a call from a JPMC branch manager named Krista Foley. As reflected in the transcript of the call (Doc. 33-1 at 66-72),[6] Foley began by explaining that she had been working with Juan Talavera, one of Plaintiff's co-workers, to assist a client. (*Id.* at 66.) Plaintiff responded that Talavera was unavailable but she would try to help. (*Id.*) After some discussion, Plaintiff tried to transfer Foley to Talavera's phone number, but Talavera did not answer the phone. (*Id.* at 67-68.) Plaintiff continued to help Foley, but after speaking to the client (who was in Foley's office), Plaintiff stated that "this account won't go through," asked for "the best way to reach" Foley, promised to take various steps to pass along Foley's inquiry to Talavera, and announced that "I cannot take this payment" and "I need to leave . . . ." (*Id.* at 69.) Plaintiff continued to help Foley before again saying that she "need[ed] to leave right away, right now, I'm already behind three minutes." (*Id.* at 70.) Foley responded, "Well I—I can't— I need you to do it, because I won't have [the client] here . . . ." (*Id.*) Plaintiff replied, "Because why?" before emphasizing for the third time that "I need to leave, I'm already three minutes behind. I need to leave right away." (*Id.*) Foley then agreed to speak to Plaintiff's supervisor, only for Plaintiff to respond "No, my supervisor's already leaving too, my teammate too are leaving 2:30. So the only way I'll be transfer to Juan. Juan will be late night today, give me a second." (*Id.*) However, after Plaintiff discovered that Talavera was unavailable, she said, "Juan's leaving too. So we're already out of the office right now. So what are you going to do[?]" (*Id.*) Foley then asked, "So you don't want— you don't want to help me anymore because you were supposed to leave three minutes ago?" (*Id.*) After Plaintiff responded by explaining why the payment was not going

---

[5]   Once again, although the parties dispute whether this conversation qualified as a "coaching" (*compare* Doc. 33-1 at 60 *with* Doc. 40-1 at 5 ¶ 29), Plaintiff doesn't dispute the substance or existence of the conversation.

[6]   It is undisputed that the call occurred and that the transcript of the call is accurate. Plaintiff only contests Defendants' characterization of the call.

through and why it would not be a problem for Foley to work with Talavera at a later date, Foley asked, "So, instead of changing it for me over the phone right now, because you need to leave for the day, I need to email Juan, and he's going to do it per my email, without discussing it with the customer, is what you're telling me." (*Id.*) Plaintiff agreed, and Foley responded "Okay. I'll be reporting this to upper management. This is absolutely ridiculous. We stay behind for customers on a regular basis, so the fact that you want to walk out the door to go home, and my customer is sitting at my desk, is absolutely ridiculous to me. This should be corrected immediately while the customer is sitting at my desk." (*Id.* at 70-71.) Following this exchange, Plaintiff ultimately helped Foley, but Foley still submitted the following internal complaint to JPMC's employee feedback team after the call was complete:

> I am incredibly embarrassed and upset with how I was treated by a department that was more worried about getting out of work on time than with helping me resolve a customer issue while the customer was at my desk. She told me she was out 3 minutes ago and asked me to email another guy. I asked to talk to the supervisor and was told they were leaving too and that they were all leaving. I demanded she help me and that it was absolutely crazy that she was trying to hang up on me when I had a client at my desk so she did relent but this is unacceptable.

(Doc. 33-1 at 64.)

    • Fifth, on October 29, 2018, Tidd had a conversation[7] with Plaintiff in which he corrected her for making non-factual statements to a customer that could violate the law. (*Id.* at 74.)

That same day, Tidd submitted a recommendation for termination ("RFT") of Plaintiff to JPMC's human resources ("HR") department. (*Id.*) In it, Tidd "recommended that [Plaintiff] be terminated from employment because of Unsatisfactory Performance specifically in the area of customer experience." (*Id.*) He noted that, since the April 2018

---

[7]     As with the earlier conversations, although the parties dispute whether this conversation qualified as a "coaching" (*compare* Doc. 33-1 at 74 *with* Doc. 40-1 at 5 ¶ 29), Plaintiff doesn't dispute the substance or existence of the conversation.

written warning, Plaintiff had received an October 26, 2018 internal complaint and an October 29, 2018 coaching on unrelated issues.  (*Id.*)  He concluded that Plaintiff's "unsatisfactory performance continues to expose the bank to risk and negatively impact the customer experience.  Therefore termination of employment is recommended."  (*Id.*)

Later that same day, Plaintiff was terminated.  (*Id.* at 76.)

On October 31, 2018, Plaintiff called the HR department to appeal her termination.  (*Id.* at 88.)  Plaintiff "stated she felt threatened by her manager."  (*Id.*)  An HR representative "asked what [Plaintiff] meant by that."  (*Id.*)  Plaintiff "stated her manager treated her differently.  [Plaintiff] did not provide any examples and stated . . . she just feels that way[] as others made the same errors."  (*Id.*)  Because Plaintiff continued to dispute her termination, the issue was "triag[ed] to HR Investigations."  (*Id.*)

Between November 15, 2018, and December 10, 2018, a JPMC HR investigator, Carrie McKenzie, conducted interviews with Plaintiff (twice), Tidd (twice), Home Lending Recovery division leader Rick Ivie, and Plaintiff's co-worker Esther Baca.  (*Id.* at 78-86.)  McKenzie also "listened to the [two] calls that [led] to [Plaintiff's] termination."  (*Id.* at 78.)

On November 30, 2018, Plaintiff called JPMC to "speak to our legal partners about her case" because she was "expecting more timely resolution of her case" and also mentioned that she planned to escalate to the Equal Employment Opportunity Commission ("EEOC"), "however she wants to give [JPMC] the opportunity to resolve her concern."  (*Id.* at 85.)  JPMC "advised the case is actively being worked."  (*Id.* at 85.)

On December 10, 2018, McKenzie concluded that "[Plaintiff] was terminated for [two] specific calls that occurred, one caused a formal complaint and one violated regulations for collections.  [Plaintiff] alleged that her manager treated her differently but gave no specific examples of this.  Additionally, the witness that [Plaintiff] provided [*i.e.*, Baca] corroborated that [Plaintiff] had performance issues, she was struggling to follow policy and that [Plaintiff] was not treated differently by her manager . . . Tidd."  (*Id.* at 77.)  McKenzie explained that she had met with Tidd and Ivie and "the calls that triggered the

RFT were listened to as well.  The information listed on the RFT is factual according to what the investigator heard on the call recordings." (*Id.*)

That same day, McKenzie informed Plaintiff that "her RFT stands as there was no evidence that was provided that shows what is on the RFT is inaccurate." (*Id.*)

II.   Procedural History

On December 11, 2018, Plaintiff asserts that she formalized a charge of discrimination with the EEOC.  (Doc. 1 ¶ 42.)[8]

On February 12, 2019, Plaintiff asserts that she amended her charge to include national origin discrimination.  (*Id.* ¶ 43.)

On September 24, 2019, Plaintiff asserts that she received a notice of suit rights from the EEOC.  (*Id.* ¶ 44.)

On December 23, 2019, Plaintiff filed the complaint.  (Doc. 1.)

On April 21, 2021, Defendants moved for summary judgment.  (Doc. 33.)

On June 7, 2021, Plaintiff filed her response.  (Doc. 40.)

On July 2, 2021, Defendants filed a reply.  (Doc. 43.)  Neither side requested oral argument.

**DISCUSSION**

I.   Evidentiary Issues

Plaintiff argues that all 10 of Defendants' proffered summary judgment exhibits are inadmissible because they are unauthenticated and that some also contain inadmissible hearsay.  (Doc. 40 at 2-3.)  Additionally, Plaintiff seeks an "adverse inference" based on Defendants' failure to produce a recording of the April 2018 call.  (*Id.*)  The Court will address those evidentiary issues before proceeding to the merits.

…

…

---

[8]   Although Defendants deny the bulk of the assertions in paragraphs 42-45 of the complaint, Defendants don't argue that Plaintiff's complaint is untimely or otherwise defective for failure to exhaust administrative remedies.

### A.   **Authenticity**

#### i.   The Parties' Arguments

Plaintiff raises a "global objection" to "unauthenticated evidence."  (Doc. 40 at 1.)  According to Plaintiff, "Defendants failed to provide *any* authenticated evidence to support their Motion as required by Rule 56.  Even the included deposition transcript contains no executed court reporter certificate . . . and the remaining exhibits are just naked hearsay with no affidavit or declaration authenticating them or laying any foundation.  This is fatal to the Motion under Rule 56(c)(2)."  (*Id.* at 1-2.)

In response, Defendants provide a copy of the court reporter's certification for the deposition transcript (Doc. 43-1), which they contend became available only recently (Doc. 43 at 2 n.1), and argue more broadly that a declaration or affidavit is not always required to support a summary judgment motion.  (Doc. 43 at 2.)  Defendants contend that "under Rule 901 of the Federal Rules of Evidence, 'evidence sufficient to support a finding that [an] item is what the proponent claims it is' satisfies the requirement for authenticating evidence.  Such evidence includes a certified copy of a deposition transcript, or excerpt therefrom, and deposition testimony of a witness with knowledge testifying 'that an item is what it is claimed to be.'"  (*Id.*)  Defendants also assert that, in her deposition, Plaintiff authenticated "her performance records; her termination notice; a transcript of the call she handled leading to her termination; H.R.'s investigation of her complaint; and [JPMC's] anti-discrimination and anti-harassment policy."  (*Id.* at 2-3.)  Finally, Defendants argue that "Plaintiff cannot refute that the evidence is admissible and authenticated when she even includes it as exhibits to her Response."  (*Id.* at 3.)

#### ii.   Analysis

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002), *superseded by rule on other grounds as recognized in Dinkins v. Schinzel*, 362 F. Supp. 3d 916 (D. Nev. 2019).  Nevertheless, "[a]t summary judgment, 'a party does not necessarily have to provide evidence in a form that would be admissible at trial.'"  *Nevada Dep't of*

*Corr. v. Greene*, 648 F.3d 1014, 1018-19 (9th Cir. 2011) (citation omitted).  Although a party "is not required to produce evidence in a form that would be admissible at trial, [it] must show that [it] would be able to present the underlying facts in an admissible manner at trial."  *De La Torre v. Merck Enters., Inc.*, 540 F. Supp. 2d 1066, 1075 (D. Ariz. 2008).  *See also* 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 165 (2021) ("[T]he party offering the material must either (1) show that the material is admissible as presented; or (2) explain the admissible form that is anticipated.").

One component of admissibility is authenticity, which is governed by Rule 901 of the Federal Rules of Evidence.  Under Rule 901(a), "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Examples of permissible authentication methods include "Testimony of a Witness with Knowledge" to establish that an item is what it is claimed to be, *see* Rule 901(b)(1), and "Distinctive Characteristics and the Like," which may authenticate evidence based on "the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," *see* Rule 901(b)(4).  With this background in mind, the Court turns to the 10 exhibits that were attached to Defendants' motion.

a.   **Transcript of Plaintiff's Deposition (Exhibit 1)**

Plaintiff argues that her deposition transcript is unauthenticated it "contains no executed court reporter certificate." (Doc. 40 at 1-2.)  This was a reasonable objection at the time it was made—the certification Defendants submitted with their motion was unsigned (Doc. 33-1 at 41) and the Ninth Circuit has stated that "[a] deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr*, 285 F.3d at 774.  But Defendants remedied this omission by submitting the completed certification page with their reply (Doc. 43-1) and explaining why that page was unavailable at the time they filed their motion (Doc. 43 at 2 n.1).  Exhibit 1 is thus properly authenticated.

…

b.     **Exhibits 2-10**

Plaintiff contends that "the remaining exhibits are just naked hearsay with no affidavit or declaration authenticating them or laying any foundation."  (Doc. 40 at 2.)  Notably, Plaintiff does not cite any case law to support her contention that an affidavit or declaration is always necessary to authenticate summary judgment exhibits.  (*Id.*)  In response, Defendants cite *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and *Coverdell v. Dep't of Soc. & Health Services, State of Wash.*, 834 F.2d 758, 768 (9th Cir. 1987), to argue that Rule 56 does not always require an affidavit.  (Doc. 42 at 2.)

Defendants are correct.  Although it is unclear why Defendants have chosen to pursue the unusual approach of authenticating their summary judgment exhibits without a declaration or affidavit, and although this approach has caused confusion and led to the needless expenditure of resources, there is nothing that prevents Defendants from pursuing it.  *See, e.g., Jeffries v. Las Vegas Metro. Police Dep't*, 713 F. App'x 549, 550 (9th Cir. 2017) ("The seven exhibits attached to the Department's [summary judgment] motion could be authenticated and provided in an admissible form at trial and the district court did not err by considering the evidence.  Deputy Owens authenticated Exhibits A and C by personal knowledge through his deposition testimony."); *AT&T Corp. v. Overdrive, Inc.*, 2006 WL 3392746, *5 (N.D. Ohio 2006) (denying motion to strike certain summary judgment exhibits, even though they were not accompanied by a certificate of authenticity, because they were "authenticated by Fassett's deposition testimony"); *Iraheta v. Lam Yuen, LLC*, 2013 WL 6713219, *4 n.4 (D. Md. 2013) ("[A]ffidavits are not the only way a document may be authenticated for summary judgment.").

Aside from the lack of an affidavit, Plaintiff does not develop any argument as to why the specific documents proffered by Defendants are inauthentic.  Indeed, Plaintiff attaches many of the same exhibits to her summary judgment response.  This is not the first time Plaintiff's counsel has engaged in this tactic.  *White v. Home Depot USA Inc.*, 2018 WL 704328, *4 (D. Ariz. 2018) (noting that plaintiffs' counsel, who is also Plaintiff's counsel in this action, "globally object[ed] to the business records cited by Defendant in its

motion" but "[t]hese objections lack specificity" and "Plaintiffs rely on several of the same documents in their Response . . . that they object to when offered by Defendant"). At any rate, because Plaintiff does not develop her authenticity challenge in any depth, the Court deems it forfeited. *Cf. Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (district court erred by sustaining "unexplained generalized objections" to summary judgment evidence).

Finally, in an abundance of caution, the Court also clarifies that it is satisfied as to the authenticity of Defendants' proffered exhibits. Specifically:

Performance Records (Doc. 33-1 at 44-48 [Exhibit 2]): During her deposition, Plaintiff testified that all documents in Exhibit 2 are what Defendants claim them to be. Thus, these documents are authenticated under Rule 901(b)(1). Specifically, the Performance Action Plan dated October 19, 2012 (Doc. 33-1 at 44) is authenticated by Plaintiff's testimony at transcript pages 40 and 45 (*id.* at 19, 24); the Documented Discussion dated February 27, 2013 (*id.* at 45) is authenticated by Plaintiff's testimony at transcript page 41 (*id.* at 20); the Documented Discussion dated May 7, 2013 (*id.* at 46) is authenticated by Plaintiff's testimony at transcript page 43 (*id.* at 22); the Documented Discussion dated April 14, 2015 (*id.* at 47) is authenticated by Plaintiff's testimony at transcript pages 45-46 (*id.* at 24-25); and the Mid-Year Customer Assistance Specialist Scorecard (*id.* at 48) is authenticated by Plaintiff's testimony at transcript page 47 (*id.* at 26).

2018 Annual Review (Doc. 33-1 at 50 [Exhibit 3]): It does not appear that Plaintiff explicitly authenticated the 2018 annual review during her deposition, nor was it proffered by Plaintiff in her response. All the same, under Rule 901(b)(4), "documents . . . could be authenticated by review of their contents if they appear to be sufficiently genuine." *Orr*, 285 F.3d at 778 n.24. In *Orr*, the Ninth Circuit noted that district courts have authenticated letters "by the linkage between the dates of postmarks and defendant's location on the days [the] letters [were] mailed" and a diary "by reviewing its contents." *Id.* The Court observes that the 2018 Annual Review is marked as "For JPMC Internal Use Only" and identifies

1    Tidd as Plaintiff's manager.  It is also formatted identically to the 2017 Annual Review,

2    which as discussed below, Plaintiff authenticated in her deposition.  Accordingly, the 2018

3    annual review is authenticated by its distinctive characteristics under Rule 901(b)(4).

4    Regardless, the Court did not rely on the 2018 Annual Review for purposes of the

5    substantive analysis in Part II below.

6        <u>2017 Annual Review</u> (Doc. 33-1 at 52 [Exhibit 3]): During her deposition, Plaintiff

7    testified that the document proffered by Defendants as her 2017 Annual Review is what

8    Defendants claim it to be.  (Doc. 33-1 at 29.)  Accordingly, this document is authenticated

9    under Rule 901(b)(1).

10        <u>Written Warning dated April 18, 2018</u> (Doc. 33-1 at 55-56 [Exhibit 4]): In the

11    declaration supporting her response to the motion for summary judgment, Plaintiff stated

12    that Exhibit 4 is what Defendants claim it to be.  (Doc. 40-1 at 4 ¶ 17, 6 ¶ 48.)  Plaintiff

13    also submitted another copy of the same document as an exhibit in support of her response.

14    (Doc. 40-1 at 288-89.)  Accordingly, there is no legitimate dispute over the authenticity of

15    this document.

16        <u>Internal Termination Records</u> (Doc. 33-1 at 58-60 [Exhibit 5]): In *Maljack*

17    *Productions, Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996),

18    the Ninth Circuit ruled that the authentication requirement was satisfied where the

19    documents at issue, many of which were printed on the plaintiff's letterhead, were

20    produced in discovery and offered into evidence by the defendant.  Here, as there,

21    Defendants produced these termination records in a way that makes obvious that

22    Defendants created them.  Additionally, Plaintiff herself seeks to offer them into evidence.

23    (Doc. 40-1 at 333-36.)  Accordingly, there is no legitimate dispute over the authenticity of

24    these documents.

25        <u>Internal Correspondence</u> (Doc. 33-1 at 62-64 [Exhibit 6]): The distinctive

26    characteristics of Exhibit 6 suggest that it is authentic.  The email header indicates that

27    Tidd forwarded this correspondence to McKenzie, who Exhibit 9 shows was the JPMC

28    employee who investigated Plaintiff's appeal.  Some participants in the correspondence

have detailed signatures suggesting that they are JPMC employees and each participant has a JPMC email address.   The underlying "Submission Verbatim" also appears to be authentic: it identifies Plaintiff's employee ID as F434365, which is established throughout the proffered evidence, and it refers to a series of events that are explained in more detail by the transcript, proffered as Exhibit 7.   Because all of this corroborating evidence has itself been separately found to be authenticated, the "appearance, contents, [and] substance . . . of the item, taken together with all of the circumstances," authenticate this exhibit under Rule 901(b)(4).

Transcript of Call (Doc. 33-1 at 66-72 [Exhibit 7]): In the declaration supporting her response to the motion for summary judgment, Plaintiff concedes that Exhibit 7 is what Defendants claim it to be.  (Doc. 40-1 at 6 ¶ 40.)    Accordingly, there is no legitimate dispute over the authenticity of this document.

Recommendation for Termination (Doc. 33-1 at 74 [Exhibit 8]): In the declaration supporting her response to the motion for summary judgment, Plaintiff concedes that Exhibit 8 is what Defendants claim it to be.  (Doc. 40-1 at 5 ¶ 34.)  Accordingly, there is no legitimate dispute over the authenticity of this document.

Internal Termination Appeal Records (Doc. 33-1 at 76-89 [Exhibit 9]): During her deposition, Plaintiff testified that Exhibit 9 is what Defendants claim it to be.  (Doc. 33-1 at 35.)  Accordingly, this document is authenticated under Rule 901(b)(1).

JPMC Policy (Doc. 33-1 at 91-98 [Exhibit 10]): During her deposition, Plaintiff testified that Exhibit 10 is what Defendants claim it to be.  (Doc. 33-1 at 22.)  Accordingly, this document is authenticated under Rule 901(b)(1).

B.   **Hearsay**

Plaintiff raises a series of undeveloped "hearsay and double hearsay" objections to Sections I.D, I.E, and I.F of Defendants' motion for summary judgment.  (Doc. 40 at 4-6.) Defendants respond, in similarly undeveloped fashion, that "the evidence in support of Defendants' Motion is admissible under the hearsay exceptions as party admissions, business records, and/or evidence not being offered for the truth of the matter asserted but

offered to show the effect on the listener, namely Plaintiff's supervisor, Mr. Jason Tidd, or Human Resources."  (Doc. 43 at 3.)

In *Sandoval*, the Ninth Circuit addressed a similar situation.  There, the defendants "submitted boilerplate one-word objections for 'relevance,' 'hearsay,' and 'foundation' to several pieces of evidence important to Plaintiff's case . . . ."  985 F.3d at 665.  Although the district court sustained those objections, the Ninth Circuit reversed, holding that the undeveloped and conclusory nature of the objections meant that it was an abuse of discretion to sustain them:

> Because the defendants did not explain the [hearsay] objections, we are largely reduced to guessing at the arguments underlying them.  One possibility is that the defendants objected on the ground that the documents themselves would not be admissible at trial because they are out-of-court statements offered for their truth.  But at the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents.  If the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment.
>
> Here, the objected-to documents either reflect the personal knowledge of individuals who could be called to testify at trial or will likely be admissible at trial under exceptions to the hearsay rule.  For example, Plaintiff's expert witnesses can testify about the opinions expressed in their expert reports, and the deputies and medical examiner can testify about the personal observations reflected in their official reports.  To the extent the police reports recount statements made by the defendants in this case, they would be admissible as non-hearsay statements of a party opponent.  Hearsay therefore provided no basis for excluding the objected-to documents in their entirety.  And to the extent the defendants intended to object to only parts of the documents, their unexplained generalized objections were insufficient to raise such an objection.

*Id.* at 666.

Here, as in *Sandoval*, Plaintiff raises "boilerplate," "unexplained," and "generalized" objections to hearsay.  Additionally, unlike in *Sandoval*, where the objecting parties at least purported to object to specific documents, Plaintiff only objects to *sections*

*of the motion for summary judgment.*  Plaintiff does not even identify specific exhibits, much less statements, to which she objects.  The Court can only speculate that Plaintiff meant to object to some statements within Exhibits 5-10, which is the evidence mentioned in Sections 1.D through 1.F, on the basis that they are out-of-court statements offered for their truth.  But hearsay arguments are notoriously fact-specific, in that a single statement might, or might not, be hearsay for several different reasons depending on what the statement is offered to prove.  And Exhibits 5-10 contain hundreds of statements to which Plaintiff might be objecting.  For this reason alone, Plaintiff's hearsay objections are overruled.  *See also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation . . . . [W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

Finally, in an abundance of caution, the Court has reviewed Exhibits 5-10 and concludes each exhibit contains statements that "either reflect the personal knowledge of individuals who could be called to testify at trial or will likely be admissible at trial under exceptions to the hearsay rule." *Sandoval*, 985 F.3d at 666.  Indeed, many of the documents recount Plaintiff's statements, which are party-opponent admissions under Rule 801(d)(2), and to the extent certain documents (such as Exhibit 7) recount conversations between Plaintiff and others, the others' statements could be offered for the non-hearsay purpose of establishing context for Plaintiff's statements.  *Cf. United States v. Whitman*, 771 F.2d 1348, 1351-52 (9th Cir. 1985) ("Shove . . . recorded his conversations with Robert when they planned Raymond's murder.  The district court admitted these tapes into evidence and played them for the jury.  Appellant contends that Shove's statements are inadmissible hearsay . . . [but] Shove's statements were not admitted for their truth but to enable the jury to understand Robert's taped statements . . . .  There was no error in admitting Shove's recorded statements.").  Perhaps there is a serious hearsay problem lurking somewhere within some exhibit, but if so, it was Plaintiff's burden to identify it.

In short, large swaths of each document "can be presented in a form that would be

- 15 -

admissible at trial . . . . Hearsay therefore provide[s] no basis for excluding the objected-to documents in their entirety.  And to the extent [Plaintiff] intended to object to only parts of the documents, [her] . . . unexplained generalized objections [are] insufficient to raise such an objection."  *Sandoval*, 985 F.3d at 666.

### C.   **Adverse Inference**

One of Defendants' proffered exhibits is the written warning that Plaintiff received in April 2018 for hanging up on a caller who had requested an escalation to management. (Doc. 33-1 at 55.)  In her response to Defendants' motion, Plaintiff asserts that because Defendants never produced a recording of the underlying call and there is a dispute over whether the caller was a customer, the Court should impose an "adverse inference . . . that Tidd lied about the nature of the call to justify issuing Plaintiff's April 2018 written warning." (Doc. 40 at 2-3.)  Notably, Plaintiff does not identify the rule (if any) that would support the imposition of such a sanction.  (*Id.*)  Further complicating things, Defendants' reply does not directly address Plaintiff's sanction request—to the extent it discusses the April 2018 call at all, it merely notes that Plaintiff's current description of that call contradicts the description she provided during her deposition.  (Doc. 43 at 5.)

Plaintiff's request for an adverse-inference sanction is both procedurally deficient and substantively meritless.  The first procedural problem is that Plaintiff tucked her request into her response to Defendants' summary judgment motion.  This is not an appropriate way to seek the affirmative relief of an adverse-inference sanction.  Rule 7(b)(1) of the Federal Rules of Civil Procedure provides that "[a] request for a court order must be made by motion."  No such motion was filed here.  *Cf. Mannion v. Ameri-Can Freight Sys. Inc.*, 2020 WL 417492, *4 (D. Ariz. 2020) ("There are sound reasons to require a party seeking spoliation sanctions in federal court to file a pretrial motion for sanctions . . . .").

The second, related procedural problem is that Plaintiff did not attempt to identify the rule or legal doctrine that would authorize the imposition of an adverse-inference sanction under these circumstances.  Under Rule 7(b)(1)(B), "[t]he motion must . . . state

1   with particularity the grounds for seeking the order."  Here, such particularity is lacking.

2      Finally, due to the undeveloped nature of Plaintiff's request, it is impossible to

3   conclude that she has established an entitlement to relief on the merits.  The materials

4   attached to Plaintiff's response suggest the recording of the April 2018 call was stored in

5   some sort of electronic format.  (Doc. 40-1 at 141 [Q: "Where is that call recorded?"  A:

6   "It's recorded in our call system."].)  Thus, the recording presumably qualifies as

7   electronically stored information ("ESI").  If Defendants *destroyed* this piece of ESI,

8   Plaintiff's request for an adverse-inference sanction would be governed by 37(e) of the

9   Federal Rules of Civil Procedure.  *See generally Fed. Trade Comm'n v. Noland*, 2021 WL

10  3857413, *5-6 (D. Ariz. 2021) ("Rule 37(e) was completely rewritten in 2015 to provide a

11  nationally uniform standard for when courts can give an adverse inference instruction, or

12  impose equally or more severe sanctions, to remedy the loss of ESI. . . .  A court cannot

13  rely on its inherent authority (or state law) when deciding whether sanctions based on the

14  loss of ESI are appropriate—the standards supplied by Rule 37(e) are exclusive.") (cleaned

15  up).  However, under Rule 37(e), Plaintiff would be required to make a series of specific

16  showings, including showings as to when the ESI was destroyed, whether litigation was

17  reasonably foreseeable at the time of destruction, and whether the ESI can be restored or

18  replaced through additional discovery.  *Id.*  Plaintiff makes no effort to address all of these

19  required elements.

20      Meanwhile, if Defendants simply *failed to produce* this piece of ESI (but it

21  otherwise still exists), Plaintiff's request for an adverse-inference sanction would governed

22  by other rules.  For example, Rule 37(b)(2)(A) authorizes a range of sanctions, including

23  an adverse-inference sanction, for violating an order to provide discovery.  *See, e.g., Higgs*

24  *v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1304-07 (11th Cir. 2020); *Liss v. Exel Transp.*

25  *Servs., Inc.,* 2008 WL 370886, *5 (D. Ariz. 2008).  However, Plaintiff makes no effort to

26  establish that Defendants violated a court order by failing to produce the recording—it is

27  unclear whether she ever propounded a discovery request for the recording[9] and the docket

28  _____

    [9]      The transcript of Plaintiff's administrative hearing for unemployment benefits,

reveals that she never filed a motion to compel related to this issue or otherwise brought a discovery dispute to the Court's attention. Meanwhile, Rule 37(c)(1)(C) authorizes "other appropriate sanctions" against a party that "fails to provide information . . . as required by Rule 26(a) or (e) . . . unless the failure was substantially justified or is harmless," but Plaintiff makes no effort to establish that Defendants were required to produce the recording under Rule 26(a) or Rule 26(e) and offers no briefing on the issues of substantial justification and harmlessness. Additionally, the scheduling order in this case provided that, "[a]bsent extraordinary circumstances, the court will not entertain fact discovery disputes after the deadline for completion of fact discovery . . . ." (Doc. 14 at 4.) Thus, Plaintiff could not stay silent throughout the discovery process about a dispute related to the discoverability of the recording of the April 2018 call, then belatedly raise such a dispute—and rely on it as the basis for a request for an adverse-inference sanction—in response to a summary judgment motion.

For these reasons, Plaintiff's request for an adverse-inference sanction related to the April 2018 call is denied. To the extent there are material disputes of fact related to the April 2018 call, those disputes will, of course, be resolved in Plaintiff's favor due to her status as the non-movant at summary judgment. But a request for an adverse-inference sanction is different from a request for application of traditional summary judgment standards.

…

---

which Plaintiff attached as Exhibit 14 to her response, suggests that Plaintiff sent a letter to JPMC on January 23, 2019 "asking for the recording" of the April 2018 call. (Doc. 40-1 at 381.) Plaintiff also alludes to this letter in her declaration. (*Id.* at 6 ¶ 49.) This letter, to be clear, was not a discovery request made as part of *this* case, which Plaintiff did not initiate until December 2019. (Doc. 1.) Meanwhile, when Tidd was asked during his deposition in this case whether he had "been able to access" the recording of the April 2018 call "since the lawsuit" began, he answered that he hadn't "tried" to access the recording "because [he] wasn't asked to." (Doc. 40-1 at 142-43.) The implication is that Tidd never looked for the recording because Plaintiff never asked for it during the discovery process. Plaintiff has not, at any rate, submitted any evidence that she submitted such a discovery request to Defendants.

1    II.    <u>Motion For Summary Judgment</u>

2          A.    **Legal Standard**

3    "The court shall grant summary judgment if [a] movant shows that there is no

4    genuine dispute as to any material fact and the movant is entitled to judgment as a matter

5    of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of

6    the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

7    in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

8    1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable

9    to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

10    *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is

11    improper where divergent ultimate inferences may reasonably be drawn from the

12    undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

13    Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will

14    be whether the evidence presented is such that a jury applying that evidentiary standard

15    could reasonably find for either the plaintiff or the defendant." *Anderson v. Liberty Lobby,*

16    *Inc.*, 477 U.S. 242, 255 (1986).

17    A party moving for summary judgment "bears the initial responsibility of informing

18    the district court of the basis for its motion, and identifying those portions of 'the pleadings,

19    depositions, answers to interrogatories, and admissions on file, together with the affidavits,

20    if any,' which it believes demonstrate the absence of a genuine issue of material fact."

21    *Celotex*, 477 U.S. at 323. "In order to carry its burden of production, the moving party

22    must either produce evidence negating an essential element of the nonmoving party's claim

23    or defense or show that the nonmoving party does not have enough evidence of an essential

24    element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co.*

25    *v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its

26    burden of production, the nonmoving party must produce evidence to support its claim or

27    defense." *Id.* at 1103.

28    …

## B.    Count One

In Count One of her complaint, which is a Title VII claim against JPMC, Plaintiff alleges that she is "a member of a protected class: race, Asian, national origin, Indonesian" and was "subject[ed] to unlawful discrimination in that she was held to a different standard than [her] non-Asian, non-Indonesian co-workers by her supervisor—disparate treatment because of her race and national origin.  Plaintiff's termination was a fruit of the unlawful discrimination evidenced by Plaintiff's supervisor."  (Doc. 1 ¶¶ 48-50.)  And in her summary judgment briefing, Plaintiff elaborates on her theory of liability as follows: "Plaintiff . . . followed complicated policies, even when her co-workers did not, yet her status as the only Asian/Indonesian on her team made her a target of her manager . . . [who] lied about policy violations to HR and others (including under oath), held Plaintiff to a higher standard than her co-workers, and ultimately recommended and approved Plaintiff's termination by stacking inappropriate and uncommunicated discipline."  (Doc. 40 at 1.)

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."  42 U.S.C. § 2000e–2(a)(1).  "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  "A person suffers disparate treatment in his employment when he or she is singled out and treated less favorably than others similarly situated on account of race."  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

The parties agree that Count One is governed by the legal framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  "Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination.  Specifically, the plaintiff must show that (1) [she] belongs to a protected class; (2) [she] was qualified for the position; (3) [she] was subject to an adverse

employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably." *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (cleaned up). "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record. . . . Under the *McDonnell Douglas* framework, [t]he requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* (citations and quotation marks omitted).

Here, Defendants concede that Plaintiff "is a member of a protected class (Asian as race, and Indonesian by national origin) and did suffer adverse employment action (termination)." (Doc. 33 at 6.) Thus, Defendants only dispute "the second [and] fourth elements of [Plaintiff's] *prima facie* case—that she was satisfactorily performing her job and meeting JPMC's expectations, and that she was treated any less favorably than her peers." (*Id.*) The Court will address the fourth element because, as discussed below, it is dispositive.

### i.    Similarly Situated Employees Who Were Treated More Favorably

Defendants argue that Plaintiff "fails to identify alleged 'comparators' to meet her prima facie burden. She alleges her co-workers were treated more favorably, but then she concedes that they lack the type of performance concerns she exhibited: she has no knowledge that the alleged comparators had performance issues with call avoidance, calling customer's place of employment or UDAAP[10] violations. She has never spoken to them about their discipline or if they have even received any disciplined for similar conduct. Such differences are fatal to [Plaintiff's] claim." (Doc. 33 at 8.)

Plaintiff responds by asserting that "[o]ther individuals were not disciplined for

---

[10]    Defendants assert that "UDAAP" refers to "unfair or deceptive act or practice." (Doc. 33 at 4.)

similar behavior."  (Doc. 40 at 9.)  The first comparator identified by Plaintiff is Juan Talavera, who she contends "committed multiple serious breaches of policy, including one warning for disseminating sexually-explicit material to co-workers and a documented discussion for criticizing a customer's choice of religious hold music as 'unethical.'"  (Doc. 40 at 9.)  The second comparator identified by Plaintiff is Chris Grinage, who she contends "was accused of making sexual sounds around co-worker Esther Baca, and it does not appear he was even the recipient of a documented discussion, much less a written warning, even though Ms. Baca was still uncomfortable around him a week later.  [Grinage] also made mistakes identical to Plaintiff without a 'coaching.'"  (*Id.*)  Finally, Plaintiff cross-references the portion of her declaration in which she states that unspecified other "co-workers" would "hang up on angry individuals, even though they were actually customers or authorized third parties," yet none of those unspecified co-workers "were ever[] disciplined for hanging up on customers."  (Doc. 40-1 ¶¶ 22-23.)

In reply, Defendants identify various reasons why Talavera and Grinage cannot be considered similarly situated comparators.  (Doc. 43 at 6-7.)

The Court agrees with Defendants that Plaintiff has failed to proffer evidence sufficient to create a triable issue of fact concerning the fourth prong of the *McDonnell Douglas* test.  At the prima facie stage, a plaintiff may show either that similarly situated individuals outside her protected class were treated more favorably or "other circumstances surrounding the adverse employment action give rise to an inference of discrimination."  *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).  Thus, Defendants are incorrect to argue that, as a categorical rule, "failure to identify a comparator is fatal."  (Doc. 33 at 8.)  Nevertheless, where (as in this case) a plaintiff has chosen "to accept the framework requiring she point to evidence of similarly situated individuals . . . the Court focuses on that issue."  *Resnick v. Sebelius*, 2014 WL 11497800, *3 (D. Ariz. 2014), *aff'd sub nom. Resnick v. Burwell*, 648 F. App'x 714 (9th Cir. 2016).  *See also Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (no error for the district court to "focus[] on whether similarly-situated persons received more favorable treatment" rather

than "look[] more broadly at whether the record as a whole gave rise to an inference of discrimination" because "the inference of discrimination that is central to plaintiffs' case" "relies on a comparison between themselves and a group of female employees").  Here, Plaintiff's claim is premised on the theory that she was "she was treated differently than her non-Asian, non-Indonesian co-workers" because "[o]ther individuals were not disciplined for similar behavior." (Doc. 40 at 8-9.)  She also identifies her own prima facie burden as proving that "she was treated different than her non-Asian, non-Indonesian co-workers." (*Id.* at 8.)  Thus, the Court will focus on Plaintiff's proffered comparators, Talavera and Grinage.

A valid comparator must be "similarly situated" to and "treated more favorably" than the plaintiff.  The Ninth Circuit has stated that "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).  "The employees need not be identical, but must be similar in material respects.  Materiality depends on the context and is a question of fact that cannot be mechanically resolved. . . .  It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees because one can always find distinctions in performance histories or the nature of the alleged transgressions." *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1114-15 (9th Cir. 2011) (citations and internal quotation marks omitted).

Talavera.  The undisputed evidence establishes that Talavera was a JPMC employee and a co-worker of Plaintiff in the Home Lending Recovery division.  (Doc. 40-1 at 112.) Plaintiff has also submitted evidence that Talavera was subjected to discipline three times: (1) a written warning from manager Tracie Evans in January 2012, because Talavera "opened a template for a customer when he did not have the proper documentation to move to modification review status" (*id.* at 358); (2) a written warning from manager Trey Hickey in December 2007 for "forwarding an email . . . with sexually explicit content to his teammates [which was] in direct violation of Chase's Harassment-Free Workplace policy" (*id.* at 361); and (3) a documented discussion from manager Jose Gutierrez in

January 2017 after Talavera was "placed on hold and during the hold time there was religious music playing in the background. . . . Talavera suggested to the authorize[d] third party that they should not play that type of music because it was unethical and the next person should not have to listen to that type of music" (*id.* at 363). Additionally, Plaintiff states in her declaration that Talavera once "gave completely wrong payment information to Christa Foley, without ever being disciplined for that." (Doc. 40-1 at 6 ¶¶ 43-44.)

Even construed in the light most favorable to Plaintiff, the evidence related to Talavera fails to establish that he was "treated more favorably" than Plaintiff. As an initial matter, it is unclear why Plaintiff believes the three incidents in which Talavera was disciplined for misconduct (or subjected to a documented discussion in response to misconduct) support her position. As noted, Plaintiff's theory of liability is that "[o]ther individuals were *not* disciplined for similar behavior." (Doc. 40 at 9 [emphasis added].) Thus, incidents of misconduct by co-workers that *did* prompt discipline are irrelevant.

This leaves Plaintiff's contention that Talavera "gave completely wrong payment information to Christa Foley, without ever being disciplined for that." At summary judgment, the Court assumes that Talavera's actions were indeed against company policy and Talavera was never disciplined. But Plaintiff does not assert, and the Court cannot assume, that Talavera's manager was aware of Talavera's mistake yet failed to take action. As noted, Plaintiff's misconduct during the Foley call came to the attention of Plaintiff's supervisor, Tidd, only because Foley was sufficiently outraged by Plaintiff's performance to lodge an official complaint via JMPC's internal complaint system. Foley's complaint did not contain any accusations of misconduct directed toward Talavera. *Cf. Resnick*, 2014 WL 11497800 at *4 ("Plaintiff submits no *evidence* in support of her claim that individuals at Ft. Yuma knew of Dr. Smalley's misconduct and took no action.").

Moreover, even assuming (despite the lack of evidentiary support for the assumption) that Talavera's manager was aware that Talavera erred, this incident was far different from the incident that provided the foundation for Plaintiff's termination. At most, Plaintiff has shown that Talavera made a mistake regarding payment terms—the

same sort of mistake that, when committed by Plaintiff, resulted in only verbal corrections or coachings by Tidd.  Plaintiff was ultimately terminated based on a series of violations, including an instance in which she (at least in Tidd's view) attempted to hang up on a customer in need of assistance because she didn't want to work late.  Even accepting that "[m]ateriality depends on the context and is a question of fact that cannot be mechanically resolved" and that "one can always find distinctions in . . . the nature of the alleged transgressions," *Earl,* 658 F.3d at 1114-15 (citations and internal quotation marks omitted), no reasonable juror could find that the transgressions were similar.  *Cf. Vasquez*, 349 F.3d at 641 (noting that alleged comparator was "not involved in the same type of offense" as plaintiff and did not "engage in problematic conduct of comparable seriousness").[11]  *See also Leong v. Potter*, 347 P.3d 1117, 1124 (9th Cir. 2003) ("Although these employees did commit serious violations, it appears none amassed a record of misconduct comparable to Leong's.  Leong's record of reprimands and suspensions suggests that the Postal Service is generous in affording employees 'second chances,' but USPS must be permitted to draw the line somewhere."); *Wall v. Nat'l R.R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983) ("The three white employees who were not discharged for conduct similar to that for which Wall was discharged had no prior disciplinary records.  When warranted by the circumstances, an employer may discipline repeat offenders more severely than first-time offenders.").

Defendants also contend that Talavera is not similarly situated because he "reports to another supervisor, [and] Defendants cannot be held responsible for how another supervisor may or may not have disciplined Mr. Talavera."  (Doc. 43 at 6.)  Indeed, it is

---

[11]   Although Plaintiff asserts in her declaration that she "frequently heard [her] co-workers hang up on angry individuals, even though they were actually customers or authorized third parties—something I knew our policies absolutely never allowed" (Doc. 40-1 ¶¶ 22-23), she does not assert that Talavera in particular ever hung up on any caller, much less an "angry" caller who was specifically a customer or authorized third party. Accordingly, this vague assertion cannot establish Talavera as a similarly situated comparator who was treated more favorably than Plaintiff.

uncontested that, at all relevant times, Talavera did not report to Tidd.[12]  Although it is error for a "district court to impose a strict 'same supervisor' requirement," "the presence or absence of a shared supervisor might be relevant in some cases."  *Hawn*, 615 F.3d at 1157-58.  The absence of a shared supervisor is relevant here and provides yet another reason for concluding that Talavera is not a valid comparator.  "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."  *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002).  It is uncontested that Talavera's alleged misconduct occurred under three different managers, none of whom was Tidd.  It is hard to imagine, and "Plaintiff has not offered sufficient explanation," how "misconduct occurring . . . under entirely different supervisors" can make Talavera similarly situated.  *Resnick*, 2014 WL 11497800 at *4.  This is particularly true under the facts of this case, where Plaintiff's theory of liability is that Tidd alone engaged in the discriminatory conduct giving rise to her claims.  (Doc. 40 at 1 ["[Plaintiff's] status as the only Asian/Indonesian on her team made her a target of her manager Defendant Jason Tidd.  Tidd lied about policy violations to HR and others (including under oath), held Plaintiff to a higher standard than her co-workers, and ultimately recommended and approved Plaintiff's termination by stacking inappropriate and uncommunicated discipline."].)

    Grinage.  According to uncontested evidence, Grinage was a JPMC employee and a co-worker of Plaintiff in the Home Lending Recovery division.  (Doc. 40-1 at 112.)  Like Plaintiff, Grinage was managed by Tidd.  (*Id.* at 367.)

    Grinage was apparently never the subject of formal discipline, but Plaintiff points to two incidents in an attempt to show that Grinage was treated more favorably despite being similarly situated.  First, Grinage was the subject of a complaint from Baca, who asserted he was "making nasty noises (sexual noises) when he passes by her."  (*Id.* at 369.)  It is undisputed that JPMC did not discipline Grinage based on that complaint.  (*Id.*)

---

[12]     In his deposition, Tidd mentions that he managed Talavera briefly (Doc. 40-1 at 111), but neither party suggests that Tidd was Talavera's manager at relevant times.

Second, Plaintiff asserts that "Grinage also made mistakes identical to Plaintiff without a 'coaching.'" (Doc. 40 at 9.) She declares that "I . . . know that my co-worker Chris Grinage failed to properly authenticate a customer via their social security number (something that Tidd got very angry at me for when I handled a married couple on the phone and one validated the social security number for the other), yet Tidd was nice to Chris Grinage and simply helped him do better next time." (Doc. 40-1 at 5 ¶ 31.)

As for the first incident, Plaintiff does not explain why Grinage's "nasty noises" should be considered "similar conduct" to hers. *Vasquez*, 349 F.3d at 641 ("[I]ndividuals are similarly situated when they have similar jobs and display similar conduct."). There is no reason to assume a manager acting in good faith would address internal personnel matters in the same manner as job-related performance matters. Even if Grinage had in fact made sexual noises toward Baca, that behavior is too distinct from Plaintiff's alleged transgressions.

As for the second incident, Defendants argue that "[d]uring her deposition, Plaintiff conceded that her alleged comparators lacked the type of performance concerns she exhibits." (Doc. 43 at 6.) But on the deposition pages that Defendants identify, Plaintiff simply concedes that she was referring to Foley when describing "petty entitled, irate and angry behaviors on behalf of the [JPMC] branch management." (Doc. 33-1 at 36.) Is it hard to understand how this concession establishes, as Defendants assert, that Plaintiff "has no knowledge that the alleged comparators had performance issues with call avoidance, calling customer's place of employment, or UDAPP violations. She has also never spoken to them about their discipline or if they have even received any discipline for similar conduct." (Doc. 43 at 6.) The Court has thoroughly reviewed Plaintiff's deposition and cannot find a concession that Talavera or Grinage lacked the type of performance concerns she exhibited.

Given this backdrop, the Court accepts as true that Grinage "failed to properly authenticate a customer via their social security number" and did not receive a "coaching," even though Tidd was aware of the error. (Doc. 40-1 at 5 ¶ 31.) But even if Grinage had

been similarly situated to and treated more favorably than Plaintiff in this case, Plaintiff has identified only a single relevant incident involving Grinage, while Plaintiff's record reflects five relevant (*i.e.*, performance-related) incidents.[13]  When a purported comparator is a first-time offender and the plaintiff is a repeat offender, that sort of difference, "*standing alone*, [is] likely is sufficient to render" them not "similarly situated."  *Resnick*, 2014 WL 11497800 at *4.  *See also Leong,* 347 P.3d at 1124; *Wall,* 718 F.2d at 909.

Because no reasonable juror could find that Grinage is similarly situated, he is not a valid comparator.  And without a valid comparator, Plaintiff has failed to establish a prima facie case under Title VII.

     ii. Pretext

Even if Plaintiff had established the existence of a valid comparator (or "other circumstances" giving rise to an inference of discrimination), and further assuming without deciding that Plaintiff had satisfied the second *McConnell Douglas* prong (adequate job performance), Defendants would still be entitled to summary judgment for the independent reason that Plaintiff has failed to proffer sufficient evidence of pretext.

"Establishing a prima facie case under *McDonnell Douglas* creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's race.  To rebut this presumption, the defendant must produce admissible evidence showing that the defendant undertook the challenged employment action for a legitimate, nondiscriminatory reason."  *Cornwell*, 439 F.3d at 1028 (cleaned up).  To meet its resulting burden of production, a defendant must "introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action."  *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004) (emphases in original).

Defendants have met the low bar of introducing evidence that, taken as true, permits the conclusion there was a nondiscriminatory reason for Plaintiff's discipline and

---

[13] This calculation includes the April 2018 written warning, the August 2018 conversation/coaching, the September 2018 conversation/coaching, the October 2018 incident with Foley, and the October 2018 conversation/coaching.

termination.  In their motion for summary judgment, Defendants refer to "legitimate, nondiscriminatory business reasons: *i.e.*, delivering poor customer service and call avoidance, violating JPMC internal policies; falsely telling a customer they could avoid a premium; and initially refusing to help a branch manager, until she threatened to speak to [Plaintiff's] supervisor." (Doc. 33 at 9.)  And in their reply, Defendants somewhat reframe the termination as being based on evidence that Plaintiff "hung up on a caller in April of 2018 and she repeatedly tried to get off the phone with a Bank Manager, who subsequently lodged a complaint against her in October 2018."  (Doc. 43 at 7.)

The RFT written by Tidd on October 29, 2018 (Doc. 33-1 at 74) is the clearest representation of JPMC's rationale for terminating Plaintiff.  That document recommends terminating Plaintiff "because of Unsatisfactory Performance specifically in the area of customer experience." (*Id.*)  It does not explicitly identify which incidents formed the basis for the termination recommendation, but it mentions the April 2018 written warning for "hanging up on a customer," the October 26, 2018 call with Foley, and the October 29, 2018 coaching for making a non "factual statement" to a customer.  (*Id.*)  Assuming the truth of these performance-related allegations would permit the conclusion that Plaintiff was terminated for a legitimate, nondiscriminatory reason.  *See, e.g.*, *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003) (performance-related concerns were a legitimate nondiscriminatory reason); *Peters v. Shamrock Foods Co.*, 2006 WL 141620, *8 (D. Ariz. 2006), *aff'd*, 262 F. App'x 30 (9th Cir. 2007) (same).

If the employer can articulate a legitimate nondiscriminatory motive for the challenged action, the plaintiff "must show that the articulated reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang*, 225 F.3d at 1124.  Ultimately, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000).  "[W]hen the plaintiff relies on

circumstantial evidence, the evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment." *Cohglan v. Am. Seafoods Co., LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005).

On the issue of pretext, the parties' arguments are as follows.  Defendants assert that "[b]eyond her subjective belief about her performance, [Plaintiff] has no evidence to establish that Defendants' legitimate nondiscriminatory reason for their employment decisions are pretext."  (Doc. 33 at 9.)  Plaintiff responds that "[t]he primary evidence of pretext in this case is Jason Tidd's series of false or evasive statements about the April 2018 situation, as well as those recounted in the termination document that he drafted and approved.  Simply put, at every turn, Jason Tidd exaggerated or falsified every report about Plaintiff."  (Doc. 40 at 10.)  Plaintiff also alludes to Defendants' alleged "failure to properly document [their] actions and reasons for [their] decision to terminate an employee," "failure to follow the employer's own policy regarding documentation and discipline," and other "evidence that the reason for a termination is incorrect or lacks a factual basis."  (*Id.* at 10-11.)  Defendants reply that "not only is her allegation false, but even if taken as true, . . . evidence purporting to show that the supervisor's reason for taking employment actions were 'exaggerated' or even 'objectively false' is not sufficient to show pretext."  (Doc. 43 at 8.)  Defendants further contend that "it is undisputed that Plaintiff hung up on a caller, which . . . gave rise to her written warning, regardless of whether the individual was a customer, noncustomer, authorized or non-authorized, as Mr. Tidd explained in the written warning. . . .  Plaintiff has not shown how . . . Mr. Tidd has somehow failed to follow JPMC's policies.  The policies specifically allow for progressive steps to be skipped as warranted."  (*Id.* at 8-9.)  Additionally, Defendants contend that, "as to the October 2018 call, the material facts supporting the issues with Plaintiff's handling of that call are, likewise, undisputed. . . .  The transcript is clear by Plaintiff's party admissions that she attempted to refuse to assist the caller, citing overtime concerns, and it was only at the caller's insistence, and at the threat of supervisor intervention, that Plaintiff eventually aided the caller in her request."  (*Id.* at 9.)

1    At the outset, the Court observes that Plaintiff's position relies on circumstantial,

2  not direct, evidence of pretext.  Thus, Plaintiff must proffer "specific" and "substantial"

3  circumstantial evidence of pretext to survive summary judgment.  *Cohglan*, 413 F.3d at

4  1096.  Plaintiff's theories of pretext can be grouped into two categories: (1) "failure to

5  follow the employer's own policy regarding documentation and discipline"; and (2) "false

6  or evasive statements" that were "exaggerated or falsified" or simply "incorrect or

7  lack[ing] a factual basis."  (Doc. 40 at 10-11.)   The Court will address each in turn.

8    <u>Failure To Follow Policy</u>.  Plaintiff cites two Ninth Circuit cases, *Earl v. Nielsen*

9  *Media Rsch., Inc.*, 658 F.3d 1108, 1117 (2011), and *Diaz v. Eagle Produce Ltd. P'ship*,

10  521 F.3d 1201, 1204 (9th Cir. 2008), in support of her claim that an inference of pretext

11  arises from Defendants' failure to follow internal policies.  (*Id.* at 10.)  This argument fails

12  because it is rests on a faulty factual premise—there is no evidence from which a

13  reasonable juror could find that Defendants did, in fact, deviate from applicable internal

14  policies when pursuing discipline against her.  For example, although Plaintiff accuses

15  Tidd of "insist[ing] upon a written warning when HR recommended coaching Plaintiff in

16  April 2018" (*id.*), the evidence in the record establishes that HR did not inform Tidd that

17  he was required to provide a coaching (rather than a written warning) based on the incident.

18  To the contrary, although HR identified a "stern" coaching of Plaintiff as *one* option, it also

19  advised that "if the consistent process is to place on a [written warning] with the first

20  incident, then we would want to be consistent with that."  (Doc. 40-1 at 336.)  Tidd was

21  further instructed to "speak with NLM[14] to ensure this is the process" and "[a]dvised if so,

22  then draft the [written warning] and send to [HR] for review and approval."  (*Id.*)  Put

23  simply, Plaintiff does not provide evidence that Tidd violated company policy by issuing

24  a written warning based on the April 2018 incident, or even that HR felt Tidd was

25  overreacting by issuing a written warning.  HR suggested *either* a stern coaching *or*, if

26  providing a written warning was the "consistent process" in Tidd's department, to speak

27

28  ---
[14]    Tidd testified that "NLM" refers to "line manager," *i.e.*, his own manager.  (Doc.
40-1 at 212.)

with his manager and seek approval from HR.  Plaintiff has not proffered any evidence that Tidd failed to follow these steps.

Plaintiff's only other example of a purported deviation from internal policy was when Tidd was "aggressive in pushing for discipline in September 2018, when HR did not feel comfortable with it." (Doc. 40 at 10.)  But as with the previous example, this claim is belied by the record.  The document of Tidd's conversation with HR on September 20, 2018 reveals that Tidd gave a detailed account of his concerns about Plaintiff's performance, including coachings that occurred as recently as the previous day, and HR asked if other coachings had been tracked.  (Doc. 40-1 at 333.)  Tidd responded that there were only two managers at the time, so they had not been "as diligent with tracking coachings." (*Id.*)  HR advised Tidd to keep coaching and tracking the coaching record and ultimately "advised [it] did not feel comfortable moving to next step in corrective action with only one coaching captured since placed on the WW in April." (*Id.*)  Tidd "understood." (*Id.*)  As this summary makes clear, Tidd did not propose discipline of any kind during the call and did not object to HR's seemingly unprompted assertion that further corrective action was inappropriate at the time.  Nowhere in this document, or in Tidd's deposition, is there evidence that Tidd was—as Plaintiff argues—"aggressive in pushing for discipline" during this call.  (Doc. 40 at 10.)  Indeed, Tidd did not pursue additional discipline against Plaintiff in the immediate aftermath of this call but instead waited until after Plaintiff was involved in two *additional* incidents in late October 2018 (the Foley call and the incident in which Plaintiff made non-factual statements to a customer that could violate the law).  No reasonable juror could construe this incident as evidence of Tidd's failure to follow internal policy related to documentation and discipline.

Exaggerated, False, Or Incorrect Statements.  Next, Plaintiff asserts that Tidd's exaggerated, false, or incorrect statements are circumstantial evidence of pretext.  (Doc. 40 at 10-11.)  Plaintiff refers generally to her summary judgment exhibits 4, 5, 8, and 14 as "exaggerated or falsified" by Tidd.  (*Id.*)  Those exhibits are the April 2018 written warning, the October 2018 RFT, HR notes about Plaintiff, and the transcript of Plaintiff's

unemployment hearing.  Plaintiff also points to "the false statement in the written warning and Tidd's mischaracterization of the October 2018 calls" as "incorrect or lack[ing] a factual basis."  (*Id.* at 10-11.)

Plaintiff is correct that, as a legal matter, an inference of pretext may arise when an employer furnishes false reasons for an adverse employment action.  But it is not enough to prove that a stated reason was false in fact—an inference of pretext arises only when an employer was aware of the reason's falseness and proffered it anyway.  *See, e.g.*, *Reeves*, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is *dissembling* to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's *dishonesty* about a material fact as 'affirmative evidence of guilt.'") (emphasis added); *Westendorf v. West Coast Contractors of Nevada*, 712 F.3d 417, 425 (9th Cir. 2013) (Rawlinson, J., concurring in part and dissenting in part) ("If the employee presents no evidence that the employer did not believe its proffered justification, summary judgment in favor of the employer is warranted."); *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1097 (9th Cir. 2005) ("In many cases where the evidence is sufficient for a rational trier of fact to conclude that the employer is *lying* about its reason for firing or demoting the plaintiff, summary judgment will be inappropriate on that basis alone because a jury could reasonably view the employer's *lie* as evidence of its guilt.") (emphasis added); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("[I]t is not important whether [Defendant's proffered justifications] were *objectively* false . . . .  Rather, courts require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (quotation marks omitted).

Because analytical energy is properly focused on the RFT—the clearest example of JPMC's "stated reasons for termination"—the Court will analyze each of the three stated reasons to determine whether Plaintiff has proffered evidence that Defendants knew them to be false.

Tidd first noted that Plaintiff "was placed on a written warning on (4/18/18) for hanging up on a customer." (Doc. 33-1 at 74.)  It is undisputed that Plaintiff hung up on someone, that Defendants' QA team alerted Tidd of the hang-up, and that Plaintiff received a written warning. (*Id.* at 67.)  However, it is unclear whether the caller was a customer. In her interview with HR, Plaintiff referred to the caller as a "customer" (*id.* at 86), but during her deposition, she referred to the caller as a "noncustomer" (*id.* at 67), and Plaintiff's written warning only describes the caller as a "third party" (*id.* at 55). Nevertheless, even assuming the caller was a non-customer, no reasonable juror could conclude this episode serves as evidence of pretext.  Even if Tidd incorrectly described the April 2018 caller as a "customer," a manager could reasonably discipline an employee for hanging up on a caller, "irate" or not.  Additionally, Tidd was responding to a referral from QA, which shows that an independent observer (who is not accused of discrimination) concluded that Plaintiff's conduct during the call was improper before Tidd was even privy to it.  Finally, Plaintiff does not proffer any evidence that Tidd was aware the caller was a non-customer but intentionally misrepresented the caller's status as a pretext to discipline her.

The next reference in the RFT is to Plaintiff's October 29, 2018 coaching "for calling POE numbers and possible UDAAP violations on the same loan number: telling the customer if you pay right now you will not receive a 10% premium.  This is a trigger statement used to make a customer take action.  However, it is not a factual statement." (Doc. 33-1 at 74.)  Tidd asserts that the putative violation was "identified . . . by an external third party to the situation.  [Smith] brought it to my attention. . . . She listened to the call during her [supervisor quality assurance], brought it to my attention . . . ."  (Doc. 40-1 at 221.)

Because the parties fail to address this episode in their briefing, the Court will set forth its understanding of what, according to the RFT, led to the October 29, 2018 coaching. First, Tidd states that Plaintiff called a customer's place of employment.  In their motion, Defendants assert that such calls are prohibited by company policy (Doc. 33 at 4), but

1   Plaintiff proffers evidence that "the customer had specifically authorized me to call him at
2   his POE which is not a policy violation." (Doc. 40-1 at 6 ¶ 37.)

3           Second, Tidd mentions a "possible UDAAP violation." (Doc. 33-1 at 74.) In brief,
4   when JPMC reaches a settlement with a customer, the customer is issued a "settlement in
5   full" letter. (Doc. 40-1 at 221-227.) That "SIF" letter contains a due date for payment.
6   (*Id.*) If the due date passes without full payment, JPMC applies a 10% premium to the
7   settled debt. (*Id.*) Only managers can waive the premium. (*Id.*) In his deposition, Tidd
8   asserted that Plaintiff was "advising [the client] that she could waive it if they paid right
9   now." (*Id.* at 222.)   Plaintiff's counsel asked: "Well, you don't—you don't say in your
10  coaching that she used the word 'waive,' correct?" (*Id.*) Tidd responded, "I guess we
11  could wordsmith it any way you want; but at the end of the day, it says the same thing."
12  (*Id.*) However, Plaintiff now submits evidence that she "simply informed this particular
13  customer that he could avoid that premium if he continued to make his previously-agreed
14  payments timely." (*Id.* at 6 ¶ 38.)

15          Tidd's deposition and Plaintiff's declaration create a legitimate factual dispute about
16  whether "telling the customer if you pay right now you will not receive a 10% premium"
17  is inaccurate or otherwise violative of JPMC policy—a reasonable juror could view the
18  statement either as a promise that Plaintiff herself would waive the premium or as a
19  description of the customer's savings if he adhered to his SIF letter. At summary judgment,
20  the Court must resolve this factual dispute in Plaintiff's favor and find that her statement
21  to the caller was accurate and did not violate company policy. This finding, in turn, which
22  would make Tidd's RFT statement to the contrary inaccurate. But Plaintiff, again, does
23  not proffer evidence that Tidd was misrepresenting his understanding of JPMC policy.
24  And it is uncontested that Smith—who is not accused of discrimination—raised the
25  putative violation to Tidd, which further undermines any suggestion that Tidd was lying
26  when he described the call as violative of company policy.

27          The final citation in the RFT is to Foley's complaint, which was sent to Tidd on the
28  same day he gave the UDAAP coaching—October 29, 2018. It is undisputed that Tidd

accurately reproduced, nearly verbatim, Foley's complaint in the RFT.  (*Compare* Doc. 33-1 at 74 *with id.* at 64.)  Additionally, any reasonable juror would agree that the complaint was "accurate," as Tidd described it to be.  After reviewing the transcript, it is inescapably clear that Plaintiff took great pains to avoid helping Foley until Foley threatened to report her behavior.  (*See generally* Doc. 33-1 at 66-72.)

Plaintiff's conduct during the call with Foley, standing alone, would serve as a nondiscriminatory reason to discipline and terminate her that cannot be viewed as pretext.  First, the transcript of the call displays—with all due respect to Plaintiff—a flagrant lack of interest in assisting customers.  No reasonable juror could read the transcript otherwise.  As with the QA team's referral of the April 2018 hang-up, Foley herself is not accused of discriminating against Plaintiff, but was nevertheless so concerned about the interaction that she filed a formal internal complaint.  And Anuj Jain, who is also not accused of discriminating against Plaintiff, described the call as "concerning" before it was forwarded to Tidd for his review.  (Doc. 33-1 at 63.)

There is a final reason why Plaintiff has not proved pretext: the temporal proximity between Plaintiff's termination and the Foley call.  In *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201 (9th Cir. 2008), the Ninth Circuit analyzed an age discrimination claim.  When discussing pretext, the Court noted the existence of "evidence that [plaintiff] caused significant damage to [defendant's] property over the course of several years . . . [and a] February 2002 incident alone resulted in $10,000 in repairs.  That [manager] fired [plaintiff] the day after that incident leaves little doubt that the property damage, rather than age, motivated [manager's] decision." *Id.* at 1214.  Here, Plaintiff was fired *on the same day* that Tidd received Foley's complaint.

In sum, Defendants have proffered legitimate nondiscriminatory reasons for Plaintiff's discipline and termination.  Plaintiff has, in turn, failed to proffer evidence from which a reasonable juror could conclude those reasons were pretextual.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's Title VII claim.

…

1

C.      **Count Two**

2      In Count Two of the complaint, Plaintiff asserts a racial discrimination claim under

3   42 U.S.C. § 1981 against JPMC and Tidd.

4      The "legal principles guiding a court in a Title VII dispute apply with equal force in

5   a § 1981 action." *Manatt v. Bank of Am.*, 339 F.3d 792, 797-98 (9th Cir. 2003).  *See also*

6   *EEOC v. Inland Marine Indus.*, 729 F.2d 1229, 1233 n. 7 (9th Cir. 1984) ("A plaintiff must

7   meet the same standards in proving a § 1981 claim that he must meet in establishing a . . .

8   claim under Title VII . . . .").  Because Plaintiff's burden in establishing a § 1981 claim is

9   identical to or weightier than her Title VII burden,[15] and she does not argue that one claim

10  would survive if the other should fail, Defendants are also entitled to summary judgment

11  on Plaintiff's § 1981 claim.

12     Accordingly,

13     **IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 33) is

14  **granted**.

15     **IT IS FURTHER ORDERED** that the Clerk enter judgment accordingly and

16  terminate this action.

17     Dated this 16th day of November, 2021.

18

19

20                                        _____

21                                        Dominic W. Lanza
                                          United States District Judge

22

23

24

25

26

---

27  [15]     The Supreme Court recently held that plaintiffs bringing a § 1981 claim must plead
28  and prove that race was the but-for cause of discrimination; mixed-motive claims are not
    available. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009 (2020).